We'll call the case of Triaxx Prime CDO et al. v. Ocwen Loan Servicing. The case of Triaxx Prime CDO et al. v. Ocwen Loan Servicing, LLC. Good morning, Your Honors. My name is Steve Perlstein from the law firm of Cobray & Kim. I represent the Triaxx entities, the appellants, on this appeal. The central issue in this case is whether or not the assignment that the issuer made to the trustee is a complete and unequivocal assignment such that the issuer no longer has standing to bring this suit. When this court reviews the record de novo, there are four aspects of these agreements that the court will see show that the assignment to the issuer was not complete and unequivocal. I'll take through those four points and then I'll go back through them a little bit more slowly. So first, the collateral that was assigned to the trustee to protect the senior note holders was also assigned to the fiscal agent to protect the junior note holders. The dual assignments show that neither assignment could be complete and unequivocal. That's point one. Point two, the assignment here was one for security. And under the relevant case law, an assignment for security is not a complete and unequivocal assignment. The third point is that the issuers here, the Triax entities, the Triax CDOs, both retained an interest in the collateral and also retained payment obligations under the agreements. Retaining payment obligations and retaining an interest in the collateral is inconsistent with a complete and unequivocal assignment. The fourth point is that the issuers actually retained powers over the collateral and empowered the collateral manager to do a number of things with respect to the collateral. Keeping those powers and delegating powers to the collateral manager is inconsistent with a complete and unequivocal assignment to the trustee. As for the collateral manager, which is also a plaintiff here in addition to the three Triax CDOs, the collateral manager has standing as well for two reasons. First, the collateral manager receives a delegation of power from the issuer because the issuer's assignment to the trustee was not complete,  but even if Akwin were correct and the assignment to the trustee was complete and unequivocal, and we think it was not, the collateral manager would still have standing because it also takes from the trustee because the collateral management agreement gives power both from the issuers and its assignees, the trustee. That's the quick summary of the points. I'll go back through them one by one. Coming back to my first point, the collateral was assigned twice. It was assigned once to the trustee to protect the senior note holders and once to the fiscal agent to protect the junior note holders. If we didn't have any other facts in the record, if I didn't have my other three points, I think that alone would demonstrate that the assignment to the trustee could not be complete and unequivocal. How could you have dual assignments, one to the trustee to protect one set of holders, one to the fiscal agent to protect another set of holders? That is completely inconsistent with the notion that the assignment to the trustee was complete. But there is more than that. The assignment is one for security. In the granting clause themselves, it talks about the fact that this was an assignment for security. It talks about the trustee being treated as a secured party. Throughout the agreements, it talks about the fact that it's for security. If the court was in any way unsure that that alone doesn't show it's for security, there are other provisions in the agreement. I would refer the court to section 10.8e, which is at tab 42-5 at 15, section 15.3, which is at 42-5 at 181. 10.8e, the trustee releases the lien on the collateral once the senior notes have been paid. Under section 15.3, upon redemption of the senior notes and the other secured obligations, the assignment terminates and everything reverts back to the issuer. It's clear that the assignment here was one for security, and under the Aaron Fair test, an assignment that is more in the nature of security is one that is not complete and unequivocal. We cite the Safeco case for that as well, and also the MHI case. With respect to my third point, the issuers retained an interest in the collateral, and they also retained responsibility for making payments. We cite to section 13 of the agreement, and section 13 sets out the priority of rights among the various holders. So there are the senior holders at the top, there are the junior holders at the bottom, and then below them is the issuer. And the issuer retains interests in and to the collateral. Retaining an interest in the collateral is inconsistent with a complete assignment, and the MHI case, which is a case that applies Massachusetts law but cites to Aaron Fair, I think explains the rationale quite nicely. Where the assignor keeps an interest in the collateral, it needs to be able to sue to protect its interest, and here the issuer kept that right. In addition to having rights to the collateral, the issuer also has payment obligations. So under section 7.1, the issuers will duly and punctually pay all principal and interest. The granting clauses provide the issuer shall remain liable under the agreements. And then in terms of the payment mechanism, in section 7.3, the trustee makes the payments on behalf of the issuer. But if the trustee doesn't make the payments, that's a default under section 5.1. And under section 5.3, it's the issuers who must pay to the trustee for the benefit of the holder of such notes, the whole amount, if any then due. So it's the issuer that retains the payment obligation. And just as the MHI case explains, where the collateral that's being assigned is actually what's going to be used to make the payments, the issuer needs to be able to protect the value of the collateral so those payments can be made. As to my fourth point, the issuers retained powers over the collateral and also empowered the collateral manager. So we cite to sections 7.5, 7.8, 12.1 for various powers the issuer has over the collateral. ACWIN, in its briefing, says that it looks at those powers and says, well, there's no right to sue within those powers. In response to that, I really have two points. First, I respectfully disagree with my friend on that point. If the court looks at 7.5A4, it says that the issuer has the power to enforce any of the pledge securities. My friend's response to that is, well, that only has to deal with protecting the grant. That can't be the case because just above it in 7.5A3, it actually says protect the validity of any grant. So the power to protect the grant is in A3. A4 is enforce any of the pledge securities, which is much broader than simply protecting the grant. So the first point is that the issuers did retain the power to sue. But even if my friend was correct and they didn't retain the power, those provisions still support us. The reason we cite those provisions is to demonstrate that the grant can't be complete and unequivocal because they retain these powers. And in reading a contract to harmonize all of the provisions, it's inconsistent to both keep all of those powers and then assign everything you have to another party. Counsel, I see your time's fleeting. If I could take you back, just one question I had. Your first point was that they had pledged this. They had assigned this twice. And I didn't quite get the idea of why, if you pledged it twice, you hadn't still divested yourself of it to somebody, and your argument seemed to be there's a trustee and a fiscal agent, but I thought that they were essentially the same party, the same interest. So, number one, if you've given it away twice, haven't you still given it away? Fair point, Your Honor. But I think what we're trying to do is to determine whether or not the grant to the trustee was complete. And that's what the district court held below. That's what the Triax SDNY case held. And it's clear that the grant to the trustee was not complete because they actually made a separate grant to the fiscal agent. And the fiscal agent is supposed to protect the junior note holders while the trustee protects the senior note holders. So they serve different purposes for those grants. But your question is, well, okay, but couldn't they send half here and half there and have nothing left? The question is can they sue, not who else can sue. Right. But the question, but I think when you look at the whole agreement, that's not what happened. We know the grant to the trustee was not complete because there's a grant to the fiscal agent, and we know that Triax, the issue was retained in interest from 13.14. So the senior note holders have an interest that's protected by the trustee. The junior note holders have an interest that's protected by the fiscal agent. And the issue are the Triax entities have their own interest that they're allowed to continue to protect. I have a question about your point about the payment obligation. Doesn't the indenture agreement provide that these were limited recourse obligations payable solely from the collateral? That is correct, Your Honor. In Section 2 of the agreement, it says the issuer's liability doesn't exceed the value of the collateral, but it's the issuer that's obligated to make those payments. So you would want to have the issuer actually be the one to protect the value of those payments, just as in the MHI case where the MHI court discusses the fact where the collateral is the primary source of payment for the underlying debt. You want the entity that has the payment obligation to still make the payment. So while the issuer might not be able to be personally liable for it, the obligation to make the payments in the agreements is still with the issuer, so the issuer should be able to enforce the agreements to protect the value of the collateral. Unless there are other questions, I will finish up any other points on reply. Thank you. You'll have your full time for rebuttal since we caused you to go over. Thank you, Your Honor. Good morning, Your Honors. Richard Jacobson on behalf of the appellee, Aquin. Your Honor, under the express terms of all three of the indenture agreements at issue in this case, the TRIAC CDOs unequivocally and completely granted all right, title, and interest in the relevant certificate holders to the indenture trustee. That granting clause expressly assigns the full power to bring legal proceedings, including this lawsuit, to the indenture trustee. There is only one entity here that was vested with the powers as the true and lawful attorney with all attendant powers to bring suits, initiate proceedings, and bring lawsuits, and that's the indenture trustee. As we all know, New York law applies here. Every single state and federal case to interpret that grant, all right, title, and interest, has held that that is a complete and unequivocal assignment that completely extinguishes standing to sue. This isn't a novel argument, Your Honor. As my friend alluded to, these same three CDOs have sued on virtually the identical agreements in the Southern District of New York in both TRIACS I and TRIACS II. They were found not to have standing. In a similar case, NCUA, the Second Circuit just two months ago, on the same identical language, all right, title, and interest, found that that assignment was complete and unequivocal and standing was extinguished. And virtually all the arguments that counsel was referring to before have been advanced before and rejected by numerous courts, including obviously the Southern District of Florida. The case that's presently before the Second Circuit, what's the status of that? The TRIACS case? Yes. I don't think there's been argument yet, Your Honor. I don't know where it is in briefing, but it is pending. There's no ruling in TRIACS SDNY on that. But there has, Your Honor, in NCUA, and many of the same arguments and almost identical language and almost identical contracts. Now, the fourth appellant here, the collateral manager, TRIACS Asset Management, is here because TRIACS claims it delegated the rights to sue to TAM in the collateral management agreements. I'll refer to them as the CMAs. But the TRIACS CDOs couldn't confer a right on TAM that they didn't have. They had already assigned all right, title, and interest to U.S. Bank as indenture trustee. And the CMAs expressly state that they are subject to in accordance with the indentures. Now, counsel was talking about a lot of the interplay between the two agreements that are at issue with respect to all three transactions. And they're all the same in all material respects, but there were three CDO trusts, 2006-1, 2006-2, and 2007-1. A couple points just to make there that are overarching and apply to every single argument that my friend was making. First of all, only one of the agreements speaks of there being the true and lawful attorney speaking of bringing proceedings, bringing lawsuits, bringing actions, and that's U.S. Bank as trustee. Two, in all respects, in all of the provisions that counsel was referring to in the collateral management agreements, they begin by saying subject to and in accordance with the indenture. And lest there be no doubt, in Section 21 of all three of the collateral management agreements, conflict of interest, it says very clearly if there is any conflict between the two agreements, it's the indenture that controls and not the collateral management agreement. Now, TRIACS is argued otherwise based on some provisions in both of the agreements as I just mentioned, and as I also mentioned, nearly all of these arguments have been advanced in New York courts and been rejected by every single New York state and federal court to look at this. They raise a couple of new issues in their reply for the first time, and that's the first time in the TRIACS suits in the SDNY in this one. They suggest for the first time that the assignment is limited in some way because they assigned certain rights in the collateral to the indenture trustees for the senior note holders and some to the fiscal agent for the junior note holders. Judge Boggs, as you rightly pointed out, they're not essentially the same entity. They are the same entity. Both the indenture trustee and the fiscal agent in the first instance was LaSalle Bank, and then U.S. Bank succeeded to both of those obligations as both indenture trustee and fiscal agent. This is a red herring, and it's made very clear on pages 8 and 28 of tab 425, which show that they're the same entities. The other argument first made on TRIACS' reply is that their assignment is not unequivocal and complete because it fells into the narrow Aaron Ferrer test. He invoked SAFCO, which discussed whether or not it has to be an antecedent debt or can be more in the nature of an antecedent debt. Let's put that aside for the moment, and let's just focus on the fact that, first of all, Aaron Ferrer, the principal holding of Aaron Ferrer, and it's one of the primary cases cited by all New York courts, is that when you assign all right title and interest, that is a complete and unequivocal assignment, and it extinguishes all standing. That's the primary holding, but there is this narrow exception, and the narrow exception only applies when the assignor, in this case the three CDOs, have an assignment of a different debt to the assignee, in this case U.S. Bank. This is objectively true. There's no doubt, no argument to the contrary. There is no debt owed by the assignors, the CDO trusts, to U.S. Bank, period, full stop. On that basis alone, the Aaron Ferrer exception cannot apply. There isn't a single case they cite applying New York law where that exception has been applied where there isn't a debt owed between, or sorry, vis-a-vis the assignor, the CDO trusts, and U.S. Bank. Now, there are very simple, straightforward, practical policy reasons behind this structure. Under counsel's argument, and there's no debate that U.S. Bank was vested with full power of attorney on and under the collateral, but under their argument, they're basically arguing that the trusts or the triaccessant manager could bring suit even if every single note holder in the investment said, no, no, don't bring the suit. No, we're fine with how Aukwin is servicing loans. We're fine with how the issuers behaved. The reason this was set up is that you have a disinterested party in U.S. Bank here that is acting on behalf of all of the secured parties. And there's a protection mechanism as well. If a majority of the note holders came forward and directed U.S. Bank to sue, whatever the actor is, Aukwin as servicer or some other party to these agreements, they would have to follow that instruction and sue. Notably, that hasn't happened here. And this isn't conjecture or a hypothesis. At 58-3 in the record, and this is CDO Note Holder Interpleader Defendant South Hiron. It's an April 5, 2016 brief. They actually accused triacs of bringing these lawsuits for no other reason other than to benefit their affiliated vendors, consultants, and lawyers. And the way these things work, if an entity brings a lawsuit relating to an underlying RMBS, and these CDOs are comprised of RMBS certificates, those lawsuits are funded from those RMBS trusts. They dilute the asset. And South Hiron lays out in fairly copious detail at pages 13 and 14 of that brief that the only reason they were doing this was to pay affiliated lawyers and vendors and that there was little, if any, benefit to the trust. That's why this structure is as it is. Now, I want to make an argument with respect to triac's asset management. They make some arguments in the collateral management agreements as to what they're invested to do and how they can sue. As we lay out in our briefs, and I won't belabor the point here, they don't have those rights. And if there was any conflict, and we don't think there was a conflict because we think the two agreements, the indenture and the collateral management agreements, are very clear. Section 21 of the collateral management agreements makes it very clear that the indenture controls. But in any event, triac's asset management has no Article III standing because there's no injury. The trustee became the sole certificate holder. These assignments occurred in 2006 for the 2006 trusts and 2007 for the 2007 trusts. But triac's alleged breaches of duties to certificates start in 2013, as they allege. That's six years after triac stopped being a certificate holder. And TAM has never been a certificate holder. For that matter, as I mentioned, they don't have Article III standing. Now, Your Honor, we make other arguments on their failure to plead gross negligence. I'm happy to go through those if you have any questions, but we think that this is very clear. Every single court that's confronted these issues on the exact same arguments, in the case of triac's and the SDNY, the exact same instruments and plaintiffs have held under New York law that they have completely and unequivocally assigned their right title and interest to the indenture trustee and therefore have no standing. With that said, I'll see you the rest of my time, and I appreciate your attention. Thank you. Thank you. If it pleases the court, I'll address what my friend discussed with respect to the collateral manager, and then I'll talk about some of the case law. This is my plan for my five minutes. But one note, there are no new issues in our reply brief. Everything that is in the reply brief is otherwise in the record and in the opening brief. There are no new issues in the reply brief. As to the collateral manager, the collateral manager has broad powers under the collateral management agreement. But to be clear, all the provisions I talked about in my opening remarks were in the indenture, so all of those provision sites I gave you were in the indenture. With respect to the collateral manager, one does look to the collateral management agreement, and in 2D11, the collateral manager has very broad powers over the collateral and also can take those actions without consulting the issuer or the trustee. Under SPRINT, CW Capital, and NETIXIS, the collateral manager is an equitable owner of the collateral. That gives it Article III standing. And it's important that the collateral manager have standing to sue because unlike the trustee who protects the senior note holders, unlike the fiscal agent who protects the junior note holders, the collateral manager protects all of the note holders, the entire capital structure. And my friend referred to some complaints from some of the holders about the collateral manager's actions. That's to be expected because those holders are looking out solely for their interests as opposed to looking out for the entire capital structure. So I will say in my experience, senior holders want to collapse a deal quickly at this point because they'll generally get paid from the collateral. The junior note holders want to keep the deal alive, hopefully for assets to recover so they can get paid in the future. And it's up to entities like the collateral manager or the issuer that are looking out for the entire capital structure, then try to balance those rights and what's best for the overall capital structure. So the fact that some note holders have a different view of that is frankly not surprising because they have different economic interests. But that's why it's so important for the collateral manager and the issuer  Do you dispute a statement by the counsel opposite that the trustee and the fiscal agent are the same? They are. They cover the same interest of everyone that you're just laying out, wouldn't they? They are the same actual corporation, but they are set up as distinct entities in these agreements with distinct purposes. The trustee in the granting clause gets a grant solely to protect the secured parties. The secured parties include the senior note holders and then basically the administrators like the trustee and the fiscal agent. That's it. So the trustee does not receive a grant to protect the rest of the capital structure. The fiscal agent gets a lien to protect the junior note holders, and the issuer is at the bottom of the capital structure there to protect itself. So while it is like the same actual corporation, but they're completely different entities in the agreement with different purposes. So it is accurate as far as it goes, but it doesn't carry the day at all. As to my friend's point about all of the cases with this language come out the same way, I respectfully disagree. In the Arron Fair case, the seminal case, the grant was all our rights and interests. So it didn't say title, but it said all our rights and interests. And Arron Fair, the seminal case, says even though that says all our rights and interests, we still find that more in the nature of an assignment for security. In the Safeco case, the grant was for all of the MES defendants' rights, all rights of the MES defendants in any subcontract. So again, you had an all-rights grant that was extraordinarily broad, but the court said because it says it's for security, because it's for security, it's still not a complete assignment. And as to the debt, there is debt here. The senior notes are outstanding, and this grant is to protect. The grant to the trustee is there to protect the senior notes. So there is absolutely debt here. But in the Safeco case, there was only future debt. In Safeco, there was an indenture agreement in Safeco as part of that indenture. May I finish? Thank you. In the Safeco case, there was an assignment. There was an indemnification agreement. As part of that indemnification agreement, there was also an assignment of rights in the contract. The indemnification agreement there was on a performance bond. So there was no debt yet. There was no existing debt. There was only future debt in the Safeco case. And notwithstanding the fact there was only future debt, the court there said it's still for security, and therefore it's an incomplete assignment. But here, there very much is debt. And that's how the provisions I cited before, 10.8 and 15.3, the grant to the trustee is specifically tied to the senior notes, and once the senior notes are gone, then the assignment disappears. So there is very much debt here. So even if the Aaron Fair test is more in the nature of security for an antecedent debt, and I think more in the nature has to mean something, and I think Safeco says future debt is okay, but even if you needed existing debt, we meet that test too. Unless the court has other questions, I will.